BRAMSON, PLUTZIK, MAHLER
& BIRKHAEUSER LLP
Alan R. Plutzik (Cal. State Bar No. 077785)
2125 Oak Grove Road
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792
aplutzik@bramsonplutzik.com

Counsel for Plaintiff

**FILED**

AUG 16 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C12-4327 JSC

| | |
|---|---|
| IRA For The Benefit Of KARL GRAULICH , derivatively on behalf of ZYNGA, INC., <br><br> Plaintiff, <br><br> -against- <br><br> MARK PINCUS, JOHN SCHAPPERT, WILLIAM GORDON, REID HOFFMAN, JEFFREY KATZENBERG, STANLEY J. MERESMAN, SUNIL PAUL, OWEN VAN NATTA, MARK VRANESH, DAVID M. WEHNER, REGINALD D. DAVIS, and CADIR B. LEE, <br><br> Defendants, <br><br> -and- <br><br> ZYGNA, INC., <br><br> Nominal Defendant. | Civil Action No.: _____ ADR <br><br> ECF CASE <br><br> **VERIFIED DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

VERIFIED DERIVATIVE COMPLAINT
66775

**ORIGINAL**

1    Plaintiff, by and through his undersigned attorneys, requests a trial by jury and alleges the

2  following upon information and belief. Plaintiff also bases this Complaint on the investigation by

3  his attorneys, which included, among other things, review of the public documents and press

4  releases of Zynga , Inc. ("Zynga" or the "Company"). Except as alleged herein, the underlying

5  information concerning defendants' misconduct, and the particulars thereof, are not available to

6  plaintiff and the public and lie within the possession and control of defendants and other Zynga

7  insiders. Based on the evidence already developed, plaintiff believes additional substantial

8  evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

9  discovery.

10                                   **NATURE OF THE ACTION**

11    1.    This is a stockholder derivative action brought on behalf of nominal defendant

12  Zynga against the "Director Defendants," named in paragraphs 9 through 16, who served on

13  Zynga's board of directors (the "Board") during the acts complained of herein, and the other

14  Individual Defendants, named in paragraphs 18 through 21, for breach of their fiduciary duties of

15  loyalty, candor and gross mismanagement. Such breaches led to damages Zynga suffered as a

16  result of the Director Defendants' participation in, or reckless failure to prevent, the sales of over

17  49 million shares of Zynga stock by corporate insiders in a secondary offering of shares on April

18  3, 2012 (the "Secondary Offering") even though in its Initial Public Offering ("IPO"), completed

19  on December 16, 2011, Zynga stated that the insider shares sold in the Secondary Offering were

20  locked up until May 28, 2012.

21    2.    The insiders sold their shares in the Secondary Offering at $12 per share.

22  Subsequent to such sale, on July 25, 2012, Zynga announced dismal second quarter financial

23  results causing its stock to plummet to under $3 per share on July 26, 2012.

24    3.    By permitting the insider sales prior to the end of the initial lock-up period, the

25  Board showed a complete lack of control over the insider sellers and, in general, its oversight of

26  the Company, leading to a vast array of stockholder lawsuits that will cost the Company extensive

27  funds to litigate, together with other expenses that will cause harm to the Company.

28

VERIFIED DERIVATIVE COMPLAINT                                                          1
66775

**JURISDICTION AND VENUE**

4.      This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it otherwise would not have.

5.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) insofar as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district. In addition, nominal defendant Zynga's principal place of business is located in this district.

**PARTIES**

6.      Plaintiff is the owner of Zynga common stock, which he has held at all times relevant hereto. Plaintiff is a citizen of New York.

7.      Nominal Defendant Zynga is a Delaware corporation headquartered at 699 Eighth Street, San Francisco, California 94103. Zynga was originally organized in April 2007 as a California limited liability company under the name Presidio Media LLC, converted to a Delaware corporation in October 2007, and changed its name to Zynga, Inc. in November 2010. Zynga completed its initial public offering in December 2011 and its Class A common stock is traded on the NASDAQ Global Select Market, which is an efficient market, under the symbol "ZNGA."

8.      Defendant Zynga is named as a nominal defendant herein solely in a derivative capacity. This action is brought on Zynga's behalf and no claims are asserted against it.

9.      Defendant Mark Pincus ("Pincus") founded Zynga in 2007 and at all relevant times served as Zynga's Chief Executive Officer, Chief Product Officer, and Chairman of Zynga's Board of Directors. Defendant Pincus signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Pincus sold approximately 16.5 million shares of Zynga stock in Zynga's IPO for proceeds of approximately $190 million. Defendant Pincus is a citizen of California.

10.     Defendant John Schappert ("Schappert") at all relevant times served as Zynga's

VERIFIED DERIVATIVE COMPLAINT                                                                                                  2
66775

Chief Operating Officer and as a director of Zynga. Defendant Schapeprt signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Schappert sold approximately 322,000 shares of Zynga stock in the Secondary Offering for proceeds of approximately $3.9 million. Defendant Schappert is a citizen of California.

11. Defendant William Gordon ("Gordon") at all relevant times served as a director of Zynga. Defendant Gordon signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Gordon is a citizen of California.

12. Defendant Reid Hoffman ("Hoffman") at all relevant times served as a director of Zynga. Defendant Hoffman signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Hoffman sold approximately 688,000 shares of Zynga's stock in the Secondary Offering for proceeds of approximately $8 million. Defendant Hoffman is a citizen of California.

13. Defendant Jeffrey Katzenberg ("Katzenberg") at all relevant times served as a director of Zynga. Defendant Katzenberg signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Katzenberg is a citizen of California.

14. Defendant Stanley J. Meresman ("Meresman") at all relevant times served as a director of Zynga. Defendant Meresman signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Meresman is a citizen of California.

15. Defendant Sunil Paul ("Paul") served on Zynga's Board of Directors at all relevant times, and was a member of the Audit Committee. Defendants Pincus and Paul have a long-term business relationship. Defendants Pincus and Paul worked together at AOL.com from 1993 through 1995. After leaving AOL.com in 1995, they co-founded Freeloader, which they sold seven months later for approximately $38 million. In recent years, Defendant Pincus was a major investor in Brightmail, Inc., a company founded by Defendant Paul. Defendant Pincus is currently a major investor in another company founded and run by Defendant Paul, SideCar. Defendant Paul signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Paul is a citizen of California.

16. Defendant Owen Van Natta ("Van Natta") at all relevant times served as a director

VERIFIED DERIVATIVE COMPLAINT
66775

3

of Zynga. Defendant Van Natta signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Van Natta sold 505,267 shares of Zynga stock in the Secondary Offering for proceeds of approximately $5.8 million. Defendant Van Natta is a citizen of California.

17. Defendants named in paragraphs 9 through 16 are collectively referred to as the "Director Defendants."

18. Defendant Mark Vranesh ("Vranesh") served as Zynga's Chief Accounting Officer at all relevant times. Defendant Vranesh sold 366,216 shares of Zynga stock for proceeds of approximately $4.2 million in the Secondary Offering. Vranesh sold an additional 9,200 shares of Zynga stock between April 15, 2012 and July 15, 2012 for proceeds of approximately $77,000. Defendant Vranesh signed the Registration Statements in connection with Zynga's IPO and the Secondary Offering. Defendant Vranesh is a citizen of California.

19. Defendant David M. Wehner ("Wehner") served as Zynga's Chief Financial Officer at all relevant times. Defendant Wehner sold 386,865 shares of Zynga stock for proceeds of approximately $4.5 million in the Secondary Offering. Defendant Wehner sold a total of 130,000 additional shares of Zynga stock on April 1, 2012, May 2, 2012, and July 2, 2012, for proceeds of approximately $1.3 million. Defendant Wehner signed the Registration Statements in connection with Zynga's IPO and the Secondary Offering. Defendant Wehner is a citizen of California.

20. Defendant Reginald D. Davis ("Davis") served as Zynga's Senior Vice President, General Counsel, and Secretary at all relevant times. Defendant Davis sold 314,643 shares of Zynga stock for proceeds of approximately $3.7 million in the Secondary Offering. Davis sold a total of 31,000 additional shares of Zynga stock on April 1, 2012, April 15, 2012, July 2, 2012, and July 15, 2012 for proceeds of approximately $3.9 million. Defendant Davis is a citizen of California.

21. Defendant Cadir B. Lee ("Lee") served as Zynga's Chief Technology Officer at all relevant times. Between April 2, 2012 and July 10, 2012, Defendant Lee sold over 1.1 million shares of Zynga stock for proceeds of approximately $13.6 million. Defendant Lee is a citizen of California.

22.     The Director Defendants and the defendants named in paragraphs 18 through 21 are collectively referred to as the "Individual Defendants."

23.     Defendants Davis, Hoffman, Lee, Pincus, Schappert, Van Natta, Vranesh, and Wehner are referred to collectively herein as the "Insider Trading Defendants."

**Obligations of the Director Defendants**

24.     The Director Defendants, by reason of their corporate directorship and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.

25.     Each Director Defendant owed to Zynga and its stockholders the duty to exercise due care, diligence and loyalty in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts related thereto.

26.     To discharge these duties, the Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Zynga. By virtue of this obligation of ordinary care and diligence, the Director Defendants were required, among other things, to:

(a)     manage, conduct, supervise, and direct the employees, business, and affairs of Zynga in accordance with federal laws, rules, and regulations;

(b)     ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Zynga;

(c)     remain informed as to how Zynga was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or illegal practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

(d)     supervise the preparation, filing and/or dissemination of any SEC filings, press releases, audits, reports or other information disseminated by Zynga and to examine and evaluate any reports of examinations, audits, or other information concerning the financial state of Zynga, and to make full and accurate disclosure of all material facts concerning, inter alia, each of the

VERIFIED DERIVATIVE COMPLAINT                                                                                 5
66775

1 subjects and duties set forth above;

2     (e)    exercise reasonable control and supervision over the officers and employees of
3 Zynga;

4     (f)    maintain and implement an adequate system of internal controls at Zynga, including
5 financial, accounting and management information systems;

6     (g)    examine and evaluate any reports of examinations or investigations by government
7 agencies concerning the practices, products or conduct of officers, directors or employees of
8 Zynga;

9     (h)    assure the assets of the Company and its subsidiaries are utilized
10 most effectively and capital expenditures and appropriations are reviewed; and

11     (i)    preserve and enhance Zynga's reputation as befits a public corporation and to
12 maintain public trust and confidence in Zynga as a prudently managed institution fully capable of
13 meeting its duties and obligations.

14 **DERIVATIVE ALLEGATIONS**

15     27.    Plaintiff brings this action derivatively, on behalf of Zynga to enforce its claims
16 against the Individual Defendants, which claims may properly be asserted by the Company and
17 which it has failed to enforce.

18     28.    The wrongs complained of herein occurred during the period when plaintiff was a
19 Company stockholder. Plaintiff continues to hold his Zynga shares. Hence, plaintiff has standing
20 to bring this derivative action on behalf of Zynga to recover damages for all of the conduct
21 described herein.

22     29.    Plaintiff will fairly and adequately protect the interests of Zynga and its
23 stockholders in enforcing the rights of Zynga against the Individual Defendants. Plaintiff's
24 attorneys are experienced in this type of litigation and will prosecute this action diligently on
25 behalf of Zynga to insure its rights and those of its stockholders. Plaintiff has no interests adverse
26 to the Company.

## SUBSTANTIVE ALLEGATIONS

30.   Zynga develops, markets, and operates online social games as live services on the Internet, social networking sites, and mobile platforms. The online social games offered by Zynga include FarmVille, Words With Friends, Matching With Friends, Scramble With Friends, The Ville, Bubble Safari, Ruby Blast, Draw Something, Zynga Slingo, CastleVille, CityVille, Hidden Chronicles, Zynga Poker, Zynga Bingo, Zynga Slots, Empires & Allies, The Pioneer Trail, and Mafia Wars. Zynga's games are available on various platforms, including Facebook, Inc. ("Facebook") and other social networks, as well as mobile platforms, such as Apple iOS and Google Android worldwide.

31.   The primary online distribution, marketing, promotion, and payment platform for Zynga's games is Facebook. Zynga has acquired substantially all of its online users through the Facebook platform and generates substantially all of its online gaming and advertising revenue through games, applications, and advertisements on the Facebook platform. Zynga earns approximately 80% of its bookings through the Facebook platform.

32.   On December 16, 2011, Zynga completed its IPO through which it issued 100 million shares of Class A common stock. The market valued Zynga at approximately $10 billion, and Zynga common stock opened trading at an initial price of $11.00 per share, 10% above the $10 per share offering price. At the time of the IPO, Defendant Pincus owned 16% of Zynga's Class B shares, providing him with 38.5% of Zynga's voting power.

33.   Pursuant to the Prospectus filed with the SEC on December 16, 2011 for the IPO, Zynga's officers and directors, including the Individual Defendants, agreed to certain lock-up provisions, restricting their sale of Zynga common stock:

All of our officers and directors and the holders of substantially all of our capital stock have entered into lock-up agreements with us which provide that they will not offer, sell or transfer any shares of our common stock beneficially owned by them for 165 days, subject in certain cases to extension under certain circumstances, following the date of this prospectus. We have agreed with Morgan Stanley & Co. LLC and Goldman, Sachs & Co. not to waive these lock-up restrictions without their prior consent.

34.   The lock-up restrictions were scheduled to expire on May 28, 2012.

1    35. On March 14, 2012, Zynga filed a Form S-1 Registration Statement and Prospectus

2   with the SEC in connection with a secondary offering of 49,414,526 shares (including over-

3   allotment option) of Zynga's Class A common stock (the "Secondary Offering") for certain

4   insider shareholders. According to a statement issued by Zynga, "[t]he principal purposes of the

5   offering were to facilitate an orderly distribution of shares and to increase the company's public

6   float."

7    36. According to the Prospectus issued in connection with the Secondary Offering, "[i]n

8   connection with our initial public offering, all of our officers and directors and the holders of

9   substantially all of our capital stock entered into lock-up agreements with us, in which they agreed

10   not to offer, sell or transfer any shares of our common stock beneficially owned by them for 165

11   days following the date of the initial public offering, subject to extension under certain

12   circumstances. We agreed with Morgan Stanley & Co. LLC and Goldman, Sachs & Co. not to

13   waive these lock-up restrictions without their prior consent. These agreements are scheduled to

14   expire on May 28, 2012."

15    37. The Prospectus also imposed lock-up restrictions on Zynga's employees, prohibiting

16   them from selling their shares of stock, stating that, "[a]s employees of Zynga, however, these

17   employees are subject to our employee trading window "blackout" policy, which prohibits sales of

18   our capital stock until the third business day after we release our earnings for the second quarter,

19   which we currently expect to occur in the last week of April."

20    38. On March 23, 2012, before the Secondary Offering was completed, Zynga filed an

21   Amendment to Form S-1 with the Securities and Exchange Commission ("SEC"). The Amended

22   Registration Statement authorized the Secondary Offering. Zynga's March 23 Amended

23   Prospectus waived the lock-up restrictions that previously restricted Zynga insiders from selling

24   their common stock until May 28, 2012. Indeed, the Prospectus announced "[w]e are releasing

25   the selling stockholders from these lock-ups to permit them to sell up to 49,414,526 shares

26   (including the underwriters' option to purchase additional shares) in this offering." On March 28,

27   2012, the Registration Statement used for the Secondary Offering received a Notice of

28   Effectiveness from the SEC, and the following day, the Prospectus used in connection with the

VERIFIED DERIVATIVE COMPLAINT                                                                    8
66775

1    Secondary Offering was filed with the SEC.

2        39.    The March 23 lock-up restrictions waiver enabled Zynga insiders, including the

3    Individual Defendants, to sell their shares of Zynga stock when the Secondary Offering was

4    completed on April 3, sooner than the May 28, 2012 expiration date.

5        40.    The insiders promptly sold shares in the Secondary Offering, for proceeds of almost

6    $600 million.  While Zynga insiders were able to sell their holdings at $12 per share before

7    Zynga's second quarter financial results were announced, Zynga's non-executive employees and

8    other public stockholders suffered colossal losses on their investments.

9        41.    On April 26, 2012, Zynga issued a press release on Form 8-K with the SEC and

10   filed a corresponding Quarterly Report on Form 10-Q with the SEC announcing its financial

11   results for the first quarter of 2012.  Zynga touted its growth in both web and mobile bookings,

12   reporting record bookings of $329 million for the quarter, up 15% year-over-year.  The press

13   release announced that "[w]e're pleased with the progress that Zynga has made in the first quarter

14   growing our audience reach 25% year over year and nearly 20% quarter over quarter."

15       42.    Zynga misrepresented or failed to disclose material adverse facts about its business,

16   operations, and growth prospects including, among other things, that:  (1) Zynga had been

17   experiencing a rapid decline in user numbers and virtual goods sold in existing web games; (2)

18   Zynga had faced substantial delays in launching new web games; and (3) Facebook, upon which

19   the Company was heavily reliant for users and bookings, had begun to change its platform and

20   user policies so as to negatively impact Zynga's current and future bookings and growth

21   prospects.

22       43.    On July 25, 2012, Zynga announced its financial results for the second quarter of

23   2012, reporting substantially lower than expected earnings and issuing a dismal forecast for the

24   rest of the year, sharply lowering its 2012 guidance.

25       44.    Zynga reported a net loss of $22.8 million in the second quarter compared to a net

26   income gain of $1.4 million for the same quarter of 2011.  Zynga's gross bookings for the quarter

27   decreased 9% to $301.6 million, compared to $329 million for the first quarter.  In addition,

28   Zynga's sales for the quarter were $332.5 million, compared to the $343.1 million that analysts

VERIFIED DERIVATIVE COMPLAINT                                                              9
66775

had projected.  Zynga also reported a profit of 1-cent per share, 84% less than the expected 6-cents per share.

45.   In addition to reporting a dismal second quarter, Zynga announced that it was drastically lowering its full-year outlook for the rest of 2012.  Zynga lowered its projected 2012 gross bookings to a range of $1.15 billion to $1.23 billion, down from an April projection of $1.43 billion to $1.5 billion.  Zynga also lowered its earnings projections to a range of 4-cents to 9-cents a share, compared to its prior expected range of 23-cents to 29-cents a share.  Moreover, Zynga decreased its full-year adjusted EBITDA guidance to $180 – 250 million, down from $400 – 450 million.

46.   Zynga's grim outlook for the second half of 2012, particularly in projected gross bookings, directly contradicted management's prior comments about expected bookings growth that Zynga's bookings would be weighted more heavily towards the second half of 2012.

47.   Zynga attributed its need to slash guidance for 2012 "to reflect delays in launching new games, a faster decline in existing web games due in part to a more challenging environment on the Facebook web platform, and reduced expectations for *Draw Something*."

48.   Prior to its July 25, 2012 announcement, Zynga had misrepresented and/or failed to fully disclose the true extent to which it had been experiencing a sharp drop-off in users of its most profitable web games and delays in developing new games to launch on social media platforms.  Indeed, a myriad of analysts expressed their shock at Zynga's lower than expected earnings and lowered 2012 guidance.  A July 26, 2012 article from *The Wall Street Journal* entitled "Zynga Shares Tank:  Analysts Take Out Scalpel," observed that "Zynga's earnings disaster has prompted analysts to come out swinging."

49.   Zynga's previously undisclosed financial problems were so unexpected that BTIG LLC analyst Richard Greenfield issued a note to investors titled "We Are Sorry and Embarrassed by Our Mistake" apologizing to investors for being bullish on Zynga, saying he was "really caught by surprise" by Zynga's failure to monetize its games.

50.   Upon this news, shares of Zynga common stock plummeted 40% down to a July 26, 2012 trading low of $2.97 per share, representing a loss in value of over 75% compared to the

insider share sales in the Secondary Offering.

51.   After the announcement of Zynga's poor second quarter earnings, Zynga stock plummeted to $2.97 per share. As noted by a July 26, 2012 *Yahoo Finance* article entitled "Zynga Insiders Who Cashed Out Before The Stock Crashed." "Zynga insiders cashed out at *exactly* the right time." (Emphasis in original.)

52.   An April 23, 2012 *The Wall Street Journal* report entitled "Zynga insider activity is all selling" reported that:

With its recently completed secondary offering, Zynga found an innovative way to allow its top executives, early investors and other insiders to sell off their stakes – despite IPO restrictions designed to prevent it.

As they sell, common shareholders . . . have watched their investments fall through the floor.

*       *       *

Between the registration date of the offering and the day it closed on April 3 [2012], Zynga's IPO bankers, led by Goldman Sachs and Morgan Stanley, agreed to modify the lockup restrictions that previously had prevented the social-game maker's insiders from selling their shares.

*And sell they did.*

By the time the cash register closed, [Defendant Pincus] and other insiders unloaded more than 49 million shares at a price of $12 per share. The offering, which included more than 6 million shares bought by the company's IPO underwriters, generated $593 million for the sellers, while providing nothing to Zynga or its common shareholders.

As the company said in its April 3 statement, "Zynga did not receive any proceeds from the sale of shares in the offering."

(Emphasis added.)

### INSIDER SELLING

53.   As a result of the Insider Trading Defendants' positions with Zynga throughout the relevant period, each knew and had access to non-public information about the business of Zynga, as well as well as finances, markets, and business prospects, via access to internal corporate documents (including operating plans, budgets and forecasts, and reports of actual operations

compared thereto), conversations with corporate officers and employees, and attendance at management and/or board meetings and committees thereof.

54.     The Insider Trading Defendants were among Zynga's top executives and tenured directors.  These defendants developed and oversaw Zynga's business strategy, many having done so for years.  The precise roles played by the defendants at the Company during the alleged insider trading are as follows.

55.     Defendants Pincus (Chief Executive Officer), Schappert (Chief Operating Officer), Vranesh (Chief Accounting Officer), Lee (Chief Technology Officer), Wehner (Chief Financial Officer, and Davis (General Counsel) comprised the top executives of Zynga with direct responsibility for all of the Company's daily operations.  Defendant Van Natta previously served as the Company's Executive Vice President and Chief Business Officer, has been on the board since August 2010, and serves on the Mergers and Acquisitions Committee.  Defendant Hoffman has served as a director since January 2008, and serves of the Audit Committee, which has stated in its charter the responsibility for reviewing earnings guidance in press releases.

56.     In these roles as management personnel and tenured directors with specific responsibilities for main corporate governance functions, each of these defendants knew and understood Zynga's business and had actual notice of the material adverse inside information alleged herein.  This was core operating information of the Company.  This information revealed that the Company's bullish growth forecasts were made without reasonable basis in fact, as confirmed when defendants were ultimately forced to reveal a huge reduction in earnings and performance guidance on July 25, 2012 – after their sales were completed.

57.     Defendants' stock sales were motivated in whole or in part by the undisclosed adverse information alleged herein.  Defendants' stock sales, completed prior to disclosure of the adverse information alleged herein, produced collective proceeds of over $240 million.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

58.     Plaintiff brings this action derivatively in the right and for the benefit of Zynga to redress injuries suffered, and to be suffered, by Zynga as a direct result of the Individual Defendants' violations of California law and breaches of fiduciary duty.  Zynga is named as a

1    nominal defendant solely in a derivative capacity.

2       59.   Plaintiff will adequately and fairly represent the interests of Zynga in enforcing and

3    prosecuting its rights.

4       60.   Plaintiff has not made a pre-suit demand on the Zynga Board to bring these

5    derivative claims because such demand would be a futile act. The Board has nine (9) members,

6    and eight (8) of the directors are named as defendants herein.

7       61.   Four of the Director Defendants – defendants Hoffman, Pincus, Schappert, and Van

8    Natta – are among the Insider Trading Defendants. These defendants were actively involved in

9    and profited from the insider trading. They sold a collective total of 18.3 million shares of Zynga

10    stock while in possession of material adverse non-public information regarding the Company's

11    business performance, yielding insider trading proceeds of approximately $240 million, including

12    massive illegal trading profits. Hence, these defendants are not disinterested and cannot exercise

13    independent business judgment on the issue of whether Zynga should prosecute this action.

14       62.   By engaging in the concerted, systematic insider trading alleged herein, these

15    Director Defendants breached their fiduciary duties of loyalty to the Company, and are therefore

16    not in a position to exercise independent business judgment with respect to the claims alleged

17    herein. These Director Defendants are not disinterested and cannot exercise independent business

18    judgment on the issue of whether Zynga should prosecute this action.

19       63.   These Director Defendants' trading was suspicious in timing and amount.

20    Defendants' trades were concerted and were extraordinary in timing and volume. Furthermore,

21    the trades – and defendants' gigantic trading profits – were only made possible by the releases

22    they negotiated from the lock-up agreements in effect pursuant to the IPO.

23       64.   These Director Defendants' concerted action of selling stock while in possession of

24    material adverse inside information demonstrates a pattern of joint conduct. Under these

25    circumstances, these directors are disabled from suing to recover said insider trading proceeds.

26       65.   The four (4) non-trading Director Defendants – defendants Katzenberg, Gordon,

27    Meresman and Paul – each signed the Registration Statement for the April 3, 2012 offering. None

28    of these Director Defendants did anything to prevent the insider trading engaged in by the other

defendants. Even worse, they affirmatively endorsed the sales and allowed them to happen by signing their names to the Registration Statement, which effectuated the unlawful conduct of the Insider Trading Defendants. As reflected by the concerted nature of the selling, each of these directors knew of the unlawful acts in which the others engaged, participated in the actions of their colleagues and failed to prevent these breaches of the duty of loyalty. In addition, these defendants approved or recklessly failed to prevent the issuance of the Company's misleading earnings projections. Therefore, they face a substantial likelihood of liability for breach of fiduciary duty, and demand on them is therefore excused.

66. All of the Director Defendants are disabled from considering a demand because they are all defendants in the securities class action lawsuits that have been filed in the U.S. District Court for the Northern District of California in the wake of Zynga's July 25, 2012 disclosures. These complaints allege violations of federal securities laws against each individual defendant named herein. The pending securities class action claims render it impossible for each defendant to impartially consider a stockholder demand as to the wrongdoing alleged herein. If the Company pressed forward with its claims against the defendants in this case, then the Company's efforts could undercut or even compromise the defense of the securities class actions, excusing demand.

67. The Board lacks sufficient independence to consider a stockholder demand. In the 2012 Proxy Statement, the Company admits that defendants Pincus, Schappert, Gordon, and Van Natta are not independent directors under governing listing standards. Defendant Hoffman has a long-term personal relationship with defendant Pincus, which prevents him from disinterestedly considering a suit against defendant Pincus. In addition, defendant Paul has a long-term, profitable business relationship with defendant Pincus, and defendant Pincus is currently a major investor in defendant Paul's most recent venture, SideCar. As a result, defendant Paul would not authorize Zynga to sue defendant Pincus.

68. Because the large percentage of voting shares of the Company that defendant Pincus owns gives him effective control, all of Aynga's Directors serve at defendant Pincus' pleasure. They would not authorize Zynga to sue defendant Pincus because they would not risk the loss of

1    substantial director compensation and their prestigious positions as Directors of the Company.

2         69.    Zynga has been and will continue to be exposed to significant losses due to the

3    wrongdoing complained of herein. The Director Defendants know that the Company has viable

4    claims against them and the other Individual Defendants that can remedy the harm they caused

5    Zynga, yet the Director Defendants have not filed any lawsuits against themselves or others who

6    were responsible for that wrongful conduct to attempt to recover for Zynga any part of the

7    damages Zynga suffered and will suffer thereby. Such a decision could not be the exercise of

8    valid business judgment, nor could it be an action taken in good faith. Therefore, a reasonable

9    doubt is raised as to whether the Director Defendants can properly consider a demand.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against All Individual Defendants)

70.    Plaintiff repeats and realleges each and every allegation set forth above.

71.    Each Individual Defendant owed to the Company and its stockholders the duty to exercise due care and diligence in the management and administration of its affairs.

72.    The Individual Defendants' conduct set forth herein was not due to an honest error or misjudgment, but rather was due to their intentional breach or reckless disregard of their fiduciary duties to the Company. By engaging in and/or failing to ensure the accuracy of statements made in connection with the Zynga IPO and prevent the sale of over 49 million shares of Zynga stock in the Secondary Offering, the Individual Defendants intentionally breached or recklessly disregarded their fiduciary duties to protect the rights and interests of Zynga and its stockholders.

73.    To discharge these duties, each Individual Defendant was required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of Zynga. By virtue of this obligation and diligence, each Individual Defendant was required, inter alia, to:

(a)    exercise reasonable control and supervision over Zynga's officers, employees, agents, business, and operations;

VERIFIED DERIVATIVE COMPLAINT                                                                      15
66775

(b)    remain informed as to how Zynga was, in fact, operating and, upon receiving notice or information of an imprudent, unsound or illegal decision, conditions, or practice, to make a reasonable investigation in connection therewith and to take steps to correct that decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright manner; and

(c)    conduct the affairs of the Company in an efficient business-like manner so as to make it possible to provide the highest quality services and maximize the profitability of the Company for the benefit of its stockholders.

74.    Consequently, Zynga and its stockholders have sustained and will continue to sustain injury and damages by reason of the Individual Defendants' intentional breach or reckless disregard of their fiduciary duties owed to the Company and its stockholders.

## COUNT II

## BREACH OF FIDUCIARY DUTY
## (Against All Director Defendants)

75.    Plaintiff repeats and realleges each and every allegation set forth above.

76.    The Director Defendants either intentionally or recklessly breached their fiduciary duties by, among other things:

(a)    permitting or causing the Company to permit the sale of insider shares in the Secondary Offering by waiving the lock-up provisions in the Prospectus issued in connection with the IPO that prohibited such sales before May 28, 2012;

(b)    knowingly or recklessly disseminating, or permitting to be disseminated, misleading information to stockholders, the investing public, and the public at large; and

(c)    allowing the Company to engage in improper business practices, thereby subjecting the Company to fines, lawsuits, and liability.

77.    In breach of their fiduciary duties owed to Zynga and its stockholders, the Director Defendants participated in or willfully failed to prevent misconduct that caused the Company to waste its valuable assets and otherwise to expend unnecessarily its corporate funds in a manner not in the best interests of the Company or its stockholders.  As a result, the Director Defendants

VERIFIED DERIVATIVE COMPLAINT                                                                    16
66775

are guilty of at least inaction amounting to recklessness in failing to control Zynga's employees, business and affairs in accordance with their fiduciary obligations, thereby rendering them personally liable to the Company for breaching their fiduciary duties.

78.     Consequently, Zynga and its stockholders have sustained and will continue to sustain injury and damages by reason of the Director Defendants' intention breach or reckless disregard of their fiduciary duties owed to the Company and its stockholders.

## COUNT III

### GROSS MISMANAGEMENT
**(Against All Director Defendants)**

79.     Plaintiff repeats and realleges each and every allegation set forth above.

80.     As detailed more fully herein, the Director Defendants each possessed a duty to Zynga and its stockholders prudently to supervise, manage and control Zynga's operations.

81.     The Director Defendants by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business and assets of Zynga.

82.     By subjecting Zynga to the unreasonable risk of substantial losses due to their failure to monitor and/or prevent the sales by insiders in the Secondary Offering, the Director Defendants failed responsibly and with due care to oversee and implement proper business practices at Zynga, thereby breaching their duties of loyalty and diligence in the management and administration of Zynga's affairs and in the use and preservation of Zynga's assets.

83.     During the course of the discharge of their duties, the Director Defendants knew or recklessly disregarded the unreasonable risks associated with the wrongful conduct described herein, and either participated in or failed to monitor and/or disclose Zynga's improper business practices in accordance with their duties to both Zynga and its stockholders.  As a result, the Director Defendants grossly mismanaged or aided and abetted in the gross mismanagement of Zynga and its assets.

84.     As a proximate result thereof, Zynga and its stockholders have been damaged and will continue to suffer damages.

## COUNT IV

### BREACH OF FIDUCIARY DUTY
**(Against All Defendants)**

85.    Plaintiff repeats and realleges each and every allegation set forth above.

86.    In violation of their fiduciary duties to Zynga and its stockholders, the Director Defendants and defendants Vranesh and Wehner signed the Registration Statement for the April 2012 Secondary Offering, which authorized and permitted the Insider Trading Defendants' unlawful stock sales. The act by these defendants of authorizing the insider sales was not a valid exercise of business judgment, and constitutes a breach of fiduciary duty.

87.    In violation of their fiduciary duties to Zynga and its stockholders, Individual Defendants Pincus, Schappert, Vranesh and Wehner, as principal executives of the Company, repeatedly issued bogus earnings guidance to Zynga's stockholders regarding the Company's prospects for 2012, as alleged herein. The other Individual Defendants participated in these breaches, or through their recklessness and/or bad faith conduct, failed to prevent them.

88.    Zynga has been and is being further damaged by the Individual Defendants' conduct in breach of their fiduciary duties.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment in favor of the Company, as appropriate, against all defendants as follows:

(a)    Removing and replacing the Director Defendants as the directors of Zynga, instituting a new election of directors and appointing a receiver for the management of Zynga until a new election of directors is called and determined;

(b)    Declaring that the Individual Defendants have violated and/or aided and abetted in the breach of their fiduciary duties to the Company and its stockholders;

(c)    Requiring the adoption of corporate governance provisions by Zynga that will prevent such insider and management misconduct in the future;

(d)    Awarding the Company compensatory damages against the Individual Defendants, individually and severally, in an amount to be determined at trial, together with pre-

1  judgment and post-judgment interest at the maximum rate allowable by law;

2        (e)    Awarding the Company punitive damages against the Director Defendants

3  for their egregious misconduct;

4        (f)    Awarding plaintiff the costs and disbursements of this action, including

5  reasonable allowances for plaintiff's attorneys' and experts' fees and expenses; and

6        (g)    Granting such other or further relief as may be just and proper under the

7  circumstances.

8  **REQUEST FOR JURY TRIAL**

9  Plaintiff requests a trial by jury.

10  Dated: August 16, 2012

                                    **BRAMSON, PLUTZIK, MAHLER**
                                          **& BIRKHAEUSER LLP**

11

12                           By:

13                                 Alan R. Plutzik
                               2125 Oak Grove Road

14                                 Walnut Creek, CA 94598
                               Telephone: (925) 945-0200

15                                 Facsimile: (925) 945-8792
                               aplutzik@bramsonplutzik.com

16

17                                 **Counsel for Plaintiff**

18  **OF COUNSEL:**

19  Robert I. Harwood
   Samuel K. Rosen

20  HARWOOD FEFFER LLP
   488 Madison Avenue

21  New York, New York 10022
   Telephone: (212) 935-7400

22  Facsimile: (212) 753-3630
   rharwood@hfesq.com

23  srosen@hfesq.com

24

25

26

27

28

VERIFIED DERIVATIVE COMPLAINT                                        19
66775

## VERIFICATION

STATE OF NEW YORK )
                        ) ss.:
COUNTY OF $N.Y$ )

Karl Graulich, being duly sworn, deposes and says:

I am the plaintiff in the within action by virtue of my sole ownership of the Karl Graulich IRA. I have read the foregoing Verified Derivative Complaint and know the contents thereof, the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

Karl Graulich

Sworn to before me this
/ )~ Day of August, 2012

Notary Public

DAVID B. SHAEV, NOTARY
PUBLIC, STATE OF NEW YORK,
QUALIFIED IN NASSAU
COUNTY, NO.02SH4733813,
COMMISSION ESPIRES 6/30 20/ Y